## In re IVAN F. BOESKY SECURITIES LITIGATION.

### FMC CORPORATION, Plaintiff,

v.

### Ivan F. BOESKY, et al., Defendants.

MDL No. 732 M21–45–MP.
No. 90 Civ. 2472 (MP).

United States District Court,
S.D. New York.

July 1, 1993.

See also 129 F.R.D. 89.

John L. Warden, Holly H. Weiss, Sullivan & Cromwell, Robert J. Lack, Chris K. Iijima, Lisa Gersh Hall, Friedman & Kaplan, New York City, for defendant Goldman, Sachs & Co.

Thomas P. Sullivan, Richard T. Franch, Robert T. Markowski, Thomas F. Cotter, Jenner & Block, Chicago, IL, Lawrence Kill, John B. Berringer, Anderson, Kill, Olick & Oshinsky, P.C., New York City, for plaintiff FMC Corp.

## OPINION

MILTON POLLACK, Senior District Judge:

### BRIEFLY

The defendant, Goldman Sachs, has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. and a hearing thereon was held of plaintiff FMC's evidence in response and in attempted support of its claims.

Defendant, an investment banker, was retained by plaintiff, FMC, in 1986 on a contingent fee arrangement to study and handle a plan to restructure the interests of its three groups of shareholders, viz., the public shareholders, the management shareholders, and the employee Thrift Plan shareholder. The plan was to distribute new shares to them in exchange for their old shares in stipulated amounts and additionally to make an extraordinary cash distribution to the public stockholders as well as some cash to the Employees' Thrift Plan to make up for the number of the new voting shares allocated to the management and the Thrift Plan in excess of

the number of old shares they previously held. The total values distributed under the restructure to the shareholders respectively were based on an estimate of the fair value of the distribution to be received by each group. The cash payments were to be financed by borrowing against the corporate equity which would serve to increase the debt to equity ratio leveraging the balance sheet of the company.

The plan, after an adjustment of the cash distributable to bring the values allocable to the public shareholders in line with the current market price of the stock allocable to the management shareholders, and thereby to equalize the relative allocations, was approved by vote of the stockholders and defendant's contingent fees were paid on May 28, 1986.

On December 18, 1986, following a regulatory lawsuit instituted by the SEC against Ivan Boesky, plaintiff filed this suit against Goldman Sachs for recovery of the fees paid to the defendant and for supposed damages from a premature disclosure by an employee of the bankers of their work in progress on some corporate financing plan pertaining to FMC. The plaintiff claims that before any public announcement of the restructure plan, defendant was in breach of the confidentiality obligation it had assumed in the employment, because defendant's employee, Brown, made a disclosure (without defendant's knowledge or authority) to an outsider that he had "deduced" that the corporate finance department was engaged in some project involving a Chicago company which he surmised to be FMC. The deduction was ultimately conveyed to Ivan Boesky, a professional arbitrageur, who thereupon bought some FMC stock. On February 21, 1986, FMC publicly disclosed that it was pursuing a recapitalization plan. Starting that day Boesky started selling off FMC stock. On February 23, 1986, FMC publicly disclosed the terms of its plan. A little over a week after this second public disclosure, Boesky recommenced purchasing FMC stock. He built up a very substantial holding, and the price of the stock rose substantially over the next month. The substantial increase of the price of the stock created a disproportion of the benefits dis-

tributable under the restructure plan in favor of the management shareholders in comparison with the benefits allocable to the public shareholders, including the cash distribution payable to them.

In consequence thereof, Goldman Sachs notified FMC that it would be compelled to withdraw the requisite fairness opinion it had furnished to FMC in February, unless the cash distributable to the public shareholders was increased from the original $70 to $80 per share, since this was necessary to equalize the relative benefits of the plan among the management, the employee shareholders, and the public shareholders. In light of the prevailing price of FMC stock, FMC's Board of Directors agreed to suggested adjustments increasing the cash distributions and the defendant then issued a revised fairness opinion.

No corporate acquisition or cost payable to any outsider was involved in the restructure of the interests of the shareholders *inter sese,* and no corporate interest of the shareholders was in fact compromised by the unfortunate premature disclosure of the nonpublic activity of the corporate finance department of the defendant involving the restructure of the equity interests of the shareholders of FMC. To the contrary, the interests of the public shareholders were unintentionally advantaged.

Plaintiff's response on the motion for summary judgment fell short of indicating any admissible evidence of specific facts to legally create a genuine issue of material fact with respect to damages to FMC's shareholders from the breach of confidentiality, nor is there any cognizable basis for a forfeiture of fees earned by and paid to defendant for accomplishing the success of the venture.

Accordingly, the motion for summary judgment for defendant will be granted and the complaint against defendant will be dismissed.

## THE RECORD IN MORE DETAIL

Plaintiff FMC is an industrial company incorporated in Delaware with its principal place of business in Chicago. Goldman Sachs is an investment banking firm with its

**626**

principal place of business in New York and is the sole remaining defendant in this case. Other defendants named originally who since have been dismissed pursuant to settlements, include: Shearson Lehman Brothers, Inc., Drexel Burnham Lambert, David S. Brown, Ira Sokolow, Dennis Levine, Ivan F. Boesky, and Boesky affiliated entities.

The following facts are substantively undisputed. In early 1985, FMC's management decided to explore the possibility of a leveraged restructuring of the company and contacted Goldman Sachs for its expertise. After initially considering a management leveraged buy-out, after studies and presentations by Goldman Sachs, FMC decided in January 1986 to pursue a stock ownership restructure in which FMC would make an extraordinary cash distribution to its public shareholders together with a new share of common capital stock in exchange for each old share held; a distribution of a lesser amount of cash to the Employees' Thrift Plan together with a number of shares of new common capital stock in exchange for each old share held; and a distribution of a number of new shares for each share of old stock held by the management stockholders (the insiders). The desired result would be a corporation, which, while still publicly owned, had a larger percentage of its equity in the hands of insiders, greater debt, and a stock price closer to the corporation's breakup value—factors that would make the company a less attractive take-over target.

No outside acquisition of property or interests was in any way involved in the plan. Only reduction of the corporate equity and a realignment of the shareholders interests therein was involved. The cost of the plan would ideally fall on every stockholder in proportion to his interest in the equity. The extraordinary cash payment to the public shareholders was to be financed by funds borrowed against equity, thereby leveraging the company and self-evidently tending to abort or deter any unfriendly or unsolicited attempt at a takeover of the company by making it unattractive therefor, and, especially, preempting the use of leveraging the company to finance such an attempt.

In pursuit of the FMC project, Goldman Sachs formed a team within the firm code named "Project Chicago." In furtherance of the project, FMC provided Goldman Sachs with confidential information, principally consisting of five year projections on corporate performance and earnings, which FMC alleges it made clear to Goldman Sachs was only to be disclosed on a "need to know" basis.

David S. Brown was employed by Goldman Sachs from June 1983 until July 1986 in the firm's Corporate Finance and Mortgage Securities Departments, but was not a member of Project Chicago. Unknown to FMC or Goldman Sachs, in mid-January 1986, Brown "deduced" through his own initiatives and inferences that Goldman Sachs was working on a major leveraged transaction for a Chicago-based client and he surmised that the client was probably FMC. Brown did not know FMC's business information or projections or the terms or timing of the potential FMC transaction, and FMC concedes that there is no evidence anyone at Goldman Sachs orally expressed FMC's name to Brown prior to the first public announcement about FMC's proposed recapitalization. Some time in late January or early February 1986, Brown told Sokolow, at the time a vice-president at Shearson, that he "thought FMC was working on something major and it might have been an LBO or some sort of leveraged recapitalization." Sokolow passed the tip to Dennis Levine, then employed at Drexel, who in turn passed the tip to Ivan Boesky, an arbitrageur. FMC concedes that Brown knew his mention of Goldman Sachs project to Sokolow violated the company's policies on client confidentiality, and that it was not within the scope of Brown's employment by Goldman Sachs to disclose his hunch or deduction to Sokolow. There is no evidence Goldman Sachs had any knowledge that Brown had passed such information to Sokolow.

From Tuesday, February 18, 1986, to Friday, February 21, 1986, Boesky and his affiliated entities purchased approximately 95,300 shares of FMC common stock, accounting for about 13% of the total of trading in FMC stock during that period. On February 18, 1986, FMC common stock opened on the

New York Stock Exchange ("NYSE") at $71.75 per share, and on February 21, 1986, the price had risen to a high of $82 during the morning session. At that point, FMC requested that trading in FMC common stock on the NYSE be temporarily suspended, and publicly announced that the company was contemplating a recapitalization. Upon resumption of trading on February 21, following the announcement, Boesky began selling substantially all of his 95,300 shares of FMC stock. The price of FMC common stock reached $85.625 at the close of trading on February 21.

On February 22, 1986, FMC's Board approved the proposed restructure of the interests of its shareholders and on Sunday, February 23, 1986, FMC publicly announced the terms of the recapitalization.

On February 28th, 1986, FMC finally committed itself to Goldman Sachs by a written engagement letter formally setting forth the terms of Goldman Sachs' engagement in the recapitalization transaction. The letter stated that Goldman Sachs would keep in confidence any non-public information provided to it by FMC, in furtherance of or otherwise in connection with the proposed recapitalization. The letter agreement defined the understanding:

> 8. .... "Confidential Information" means all data, reports, interpretations, forecasts and records containing or otherwise reflecting information concerning FMC and its affiliates and subsidiaries which is not generally available to the public, together with analyses, compilations, studies or other documents, whether prepared by FMC, Goldman, Sachs & Co. or others, which contain or reflect such information.
>
> Notwithstanding the foregoing, the following will not constitute "Confidential Information" for purposes of the paragraph eight:
>
> (a) ... information which became generally available to the public [after Goldman Sachs' engagement by FMC] without any breach by us of the provisions of this paragraph eight.

The letter also provided that the employment was on a contingent fee basis and that if and only if the plan was accepted by the shareholders and consummated, FMC would pay a fee of $17.5 million to Goldman Sachs. FMC claims that the confidentiality commitment was orally applicable from the time that Goldman Sachs was first approached by FMC.

In a letter to FMC for its directors, dated February 21, 1986, Goldman Sachs described the terms of the proposed recapitalization and gave its opinion that the proposed transaction would be fair to shareholders. Under the proposed transaction, management shareholders would receive 5.667 shares of new common stock for each share of old common stock held; FMC's Thrift Plan would receive 4 shares of new common stock and $25 in cash for each old share; and public shareholders would receive one share of new common stock and $70 cash for each old share. Underlying Goldman Sachs' fairness opinion was its estimate that old FMC stock was worth $85 per share on its projection that the market would value new FMC stock (the "stub equity") at $15 per share when issued. Thus, the public, management, and thrift shareholders would each receive $85 of value for each share of old FMC stock surrendered: public shareholders would receive $70 cash plus $15 projected value of stub equity = $85 per share of old FMC stock; management shareholders would receive 5.667 new shares valued at $15 per share for a total package of $85 per share of old FMC stock; and FMC's Thrift Plan would receive $25 cash plus four new shares of $15 projected value, a total package of $85 per share of its old FMC stock. The $85 estimated value of FMC's old stock was corroborated by the stock's market value of roughly $85 on February 21, 1986.

Unknown to FMC or Goldman Sachs, on February 24, 1986, the day after the public announcement of the terms of the restructure proposed, Boesky's head of research, Lance H. Lessman, recommended to Boesky that he buy FMC stock, citing in a memorandum dated February 24 reasons including:

(1) Lessman's calculation that the stub equity would be worth more than the $15 projected by FMC and Goldman Sachs;

(2) Lessman's anticipation that the market price of FMC stock would rise because of an upward movement in the Dow Jones Industrial Average and a decline in interest rates; and

(3) Lessman's belief that the recapitalization proposal was unfair to the public shareholders and unfairly benefitted the corporate insiders and that there thus was the possibility of a revision of the proposal or the emergence of a competing bid.[1]

Boesky, however, took no immediate action on Lessman's recommendation until March 3 to April 4, 1986, during which he bought about 1,922,000 shares, accounting for more than 50% of the total trading volume in FMC stock during the period. On April 7, 1986, Boesky and affiliated entities filed a Schedule 13–D with the SEC, disclosing the dates and amounts of Boesky's FMC purchases. During this period the market price of FMC stock rose from $87.25 on March 12, 1986, to $93.75 on April 4, 1986.

Frank P. Brosens, an officer in Goldman Sachs' Arbitrage Department, spoke with Lessman, among others, after the disclosure by FMC of the restructure plan and its terms. Brosens worked on the transaction and had a "need to know" of its details. Brosens was told to "go out into … the arbitrage community," "to explain to them those areas of the transaction that they didn't understand," and "to keep an ear open to hear if he heard any rumors in the marketplace about any third party activity, in effect, a risk that somebody might come in and top our recapitalization bid and try to buy the company away from us." (Testimony of John Talbott, Transcript of Rule 43(e) hearing of April 6, 1993, at 92).

No evidence whatsoever was adduced or indicated to exist that Brosens ever disclosed the sensitive five year projections or any business information to Lessman. FMC has sought to support its contention that Brosens must have passed confidential information to Lessman by abbreviated passages from three of Lessman's research memoranda, selected from Lessman's files mentioning purported

conversations with Brosens. These memoranda, which refer to no business information of FMC, are dated March 12, March 14, and April 28, 1986. Lessman's files contain many other memoranda but those are ignored by FMC. The ones relied on by FMC are bowdlerized by FMC and ignore uncited sections thereof that contemporaneously negate the assertions even attempted by FMC.

Seriatim the three memoranda to Boesky that are supposed to summarize the talks with Brosens read:

*March 12, 1986*

You will note that we are reasonably comfortable that as a leveraged buyout or as an acquisition this company is worth par or perhaps in this environment north of par. ___ kind of indicated that par would be a full price but they certainly have an ax to grind and they are also the same people who are putting an implicit break even of $15 per share on the new FMC equity stub. I would come down that par is probably conservative buyout valuation of this company.

\*　　\*　　\*　　\*　　\*　　\*

**[The following was omitted by FMC from the same memorandum]**

The restructuring is very vulnerable to interference. It is one of the most blatantly discriminatory transactions that I have seen and there are definitely ways to pump out more value to shareholders even if it is just giving everybody the same fair shake fighting the cash and the equity.

*March 14th, 1986*

Goldman confirmed to me that it was their impression that values were increasing in the stub equity, it was a good thing to have. I got very quiet but confident confirmation from FB and he felt I was doing the right thing in FMC.

\*　　\*　　\*　　\*　　\*　　\*

**[The following was omitted by FMC from the same memorandum]**

I am really very happy the way this is shaping up in the face of a rising stock

---

1. A stockholder's suit against the company and its directors was filed on February 25, 1986, charging unfairness in the proposed distributions under the restructure plan, unduly favoring the inside management shareholders. This suit was terminated after the plan was adjusted.

market and a lawsuit being filed, This security is the right place to be and I can see any number of ways that we can make money: a) nothing happens and we make an arbitrage spread; b) someone attacks from the outside and we make $10 or $20 per share; c) the restructure deal and we make the arbitrage spread plus an additional $4; d) the market stays where it is or even goes higher and we make a better than normal arbitrage spread with nothing else happening.

*March 27th, 1986* [**The following memorandum was omitted**]

I regard the FMC recap plan as one of the more inequitable and more aggregious (sic) things proposed since Phillips tried to steal $1 billion or $2 billion from its public shareholders this plan really should not happen as proposed, it is robbery. I believe that the plan is very vulnerable if it is highlighted to institutional and public shareholders and the company is very vulnerable to an outside bid.

If we took an unorthodox position in this 13–D it really does stake out the turf for us as a guardian of shareholder rights.

Lance Lessman

*April 28th, 1986*

I had several conversations with GS today and their indication is that they are not nervous, and that their only concern was a Drexel entry, and that their perception is that the Salomon buying is not as aggressive as all that, and the bulk of it is arbitrage buying.

\*     \*     \*     \*     \*     \*

My posture remains a seller at $99. I believe it is the prudent posture, it is the balance posture, and it is the correct posture for us. Let's ring the cash register.

On **April 2nd** in an S–2 form publicly filed with the SEC, FMC publicly exposed all of its sensitive financial data and projections. Lessman's files confirm this S–2 filing as one of his sources in his research memorandum of April 3, 1986. Px L at 251032.

Lessman, a witness called by FMC, testified that neither Brosens nor anyone else at Goldman Sachs ever provided him with any inside information about FMC, told him when to buy or sell FMC stock, or encouraged him to manipulate the price of FMC stock. No evidence of specific facts was adduced to the contrary by FMC.

By the week of Monday, April 21, 1986, through Friday, April 25, 1986, FMC stock traded at between $95.50 and $97.50 per share. Goldman was concerned that because the market price of FMC stock had risen substantially above the $85 value underlying its fairness opinion, the management shareholders were now unfairly advantaged by the allocations in the restructure plan over public shareholders. The plan had not yet been submitted for the vote of the public shareholders. Goldman Sachs concluded that it would therefore have to withdraw its February 21, 1986, fairness opinion unless FMC revised its proposal to take account of the current market value of FMC stock, either by increasing the cash paid to public shareholders from $70 to $80 per share of old FMC stock or by decreasing the number of new FMC stock to be given to management shareholders for each of their shares of old FMC stock. Since the latter alternative would result in loss of favorable capital gains tax rates on the distributions, FMC opted for the former. The Board of Directors agreed; and on April 26, 1986, FMC announced publicly that it would increase the cash distributable to public shareholders to $80 per share and that it would increase the shares of new FMC stock to be issued to FMC's Thrift Plan from 4 shares to 4.209 shares per share of old stock. The deal would not change with respect to management shareholders.

On the same day, April 26, 1986, Goldman issued a new fairness opinion. Underlying the new opinion was a projected value for the stub equity of $17.14 per share. Thus the public, management, and Thrift shareholders would each receive values of $97.14 per old share.[2] The $97 market price of the stock once again corroborated the value of the packages to be allocated to the respective

---

**2.** $80 cash plus $17.14 stub equity for public shareholders = $25 plus 4.29 × $17.14 for Thrift Plan = 5.667 × $17.14 for the management shareholders = $97.14.

stockholders. Approximately 21.8 million shares of old FMC stock were held by public shareholders at the time, and the revised deal would require FMC to leverage the company by an additional $218 million approximately. In a prior proceeding in this case, the district court in Illinois ruled that: "the court finds that the increased debt incurred as a consequence of the revised recapitalization did not damage FMC as a matter of law." *FMC v. Boesky,* 727 F.Supp. 1182, 1191 (N.D.Ill.1989).

Boesky began selling his FMC stock holdings on Monday, April 28, 1986, and altogether realized alleged profits exceeding $15 million.

On May 2, 1986, FMC distributed to its shareholders a proxy statement/prospectus which described the revised terms of the recapitalization, and the FMC board recommended that the shareholders vote for the recapitalization at the upcoming May 22, 1986, shareholders meeting. The proxy statement/prospectus contained the business projections which FMC had previously disclosed in its S–2 statement filed on April 2, 1986. The revised recapitalization plan was approved by the affirmative vote of FMC's shareholders at their meeting on May 22, 1986, and was implemented on May 28, 1986.

The stub equity traded on a when-issued basis at $19.25 on the first day of trading, May 29, 1986. The $19.25 value was $2.11 more than projected by the fairness opinion. Thus, ironically, by the first day of trading the revised restructure yielded public shareholders $99.25 per old share while management shareholders obtained $109.09 of value.[3] The market values held that way and continued upwards for years.

Goldman Sachs was paid its contingent fee for its services on May 28, 1986. The transaction proved to be a tremendous success. A year after its consummation, FMC's president hailed the recapitalization as a "bold move that secured our future."

On November 14, 1986 the SEC filed an injunctive suit under its regulatory functions alleging that Boesky had traded in the securities of at least seven companies, including FMC, with the benefit of non-public information provided by Dennis Levine. The SEC's complaint also implicated David S. Brown and Ira B. Sokolow. According to the SEC, Brown "learned material non-public information relating to a contemplated recapitalization of FMC which he had a duty to keep confidential," which was passed to Levine who passed it to Boesky. The SEC's complaint against Boesky said nothing about any insider trading in FMC stock after the February 23rd public announcement of the terms of the recapitalization, nor was there any suggestion that financial information of FMC had been accessed by Boesky.

FMC nonetheless in its original complaint and First Amended Complaint decided to ground damages claims on a wholly speculative "information and belief" allegation that Boesky's trading in March and April was based on inside information that originated from Brown (First Amended Complaint ¶ 46). After discovery provided no basis whatsoever for that claim, FMC withdrew it in its Second Amended Complaint. FMC then chose to suggest that Brosens had furnished business information to Lessman as allegedly indicated by three memoranda dated in mid-March and April 1986. No admissible evidence whatsoever of specific facts support FMC's speculation, as we will show.

### PRIOR PROCEEDINGS

On December 18, 1986, FMC filed suit in the U.S. District Court for the Northern District of Illinois against Boesky, Goldman Sachs, and other defendants since dismissed from the suit by way of settlement with FMC, alleging a variety of federal securities fraud, RICO and state law claims, seeking as damages $235 million it had "overpaid" to consummate its revised recapitalization that it otherwise would not have had to pay, but for misconduct of the named defendants.

In April, 1987, the district court in Illinois (Williams, D.J.) dismissed FMC's action under Rule 12(b)(6), holding that FMC's complaint alleged no legally cognizable injury and that FMC therefore lacked constitutional standing to assert its federal claims. The

---

**3.** 5.667 × $19.25 stub equity value = $109.09; $19.25 plus $80 cash = $99.25.

court declined to exercise pendent jurisdiction over FMC's state law claims. *FMC Corp. v. Boesky*, 673 F.Supp. 242 (N.D.Ill. 1987).

On appeal, the Seventh Circuit, expressly considering only the narrow issue of "whether FMC has constitutional standing to assert its claims in federal court," *FMC Corp. v. Boesky*, 852 F.2d 981, 987 (7th Cir.1988), reversed the district court by a vote of 2–1 (Manion, C.J., dissenting), stating:

> We therefore hold only that the district court erred in dismissing FMC's complaint for lack of Article III or constitutional standing. We do *not* hold that FMC has satisfied any of the non-constitutional or prudential standing limitations recognized in this opinion.

*Id.* at 994. The circuit court held that where plaintiff has alleged that "Boesky, with other defendants' help, wrongfully misappropriated FMC's confidential business information and then used that information to further his own financial interests[,] ... this misappropriation constitutes a distinct and palpable injury that is legally cognizable under Article III's case or controversy requirement." *Id.* at 989–90. Boesky was still a named defendant in this suit at the time of this opinion. The court continued: "Although FMC was not actually deprived of the information itself, FMC, as a result of this wrongful conduct, was denied the right to use exclusively its confidential information..... And that is an injury." *Id.* at 991.

The Seventh Circuit expressly recognized, but did not reach, the question of whether "FMC is entitled to recover a specific amount of damages—e.g., the [suggestion of an] increased 'cost' of the recapitalization, the fee it paid to Goldman, or Boesky's profits." *Id.* at 992 (issue of damages "is not the question here").

On remand, the district court again dismissed under Rule 12(b)(6) FMC's federal securities law claims (Counts I through V of the Amended Complaint) with prejudice on the general grounds, among others specifically applicable to certain of FMC's securities claims, that FMC suffered no legally cognizable actual damages, including the alleged "overpayment" to its shareholders.[4] The court also dismissed without prejudice Counts VII and VIII, alleging RICO claims, and stated that FMC will have the opportunity to amend its complaint to reallege these claims, if after discovery, it can do so consistent with the court's opinion and meet the obligations of Rule 11, Fed.R.Civ.P.[5]

On April 11, 1990, the action was transferred to this Court by order of the Judicial Panel on Multi–District Litigation, pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings in the *In re Ivan F. Boesky Securities Litigation*, MDL 732.

On September 11, 1992, the sole remaining defendant, Goldman Sachs moved for summary judgment dismissing for lack of damages all of FMC's remaining claims. Goldman Sachs also moved for an order striking all allegations of the Second Amended Complaint claiming that any action by or attributable to Goldman Sachs caused Boesky's trading in FMC shares following the public announcement of the recapitalization; and for summary judgment dismissing for legal insufficiency FMC's claims for fraudulent inducement (Count X), negligence (Count XI), misappropriation (Count XIV), and intentional interference with prospective economic relationship (Count XVI). In making the motion for summary judgment for lack of damages, Goldman Sachs asks the Court to assume *arguendo* for the limited purpose of the motion that Goldman Sachs had a contractual, fiduciary, or other duty to FMC to keep information relating to its engagement on

4. *FMC Corp. v. Boesky*, 727 F.Supp. 1182, 1188–93 (N.D.Ill.1989). The district court stated:
   As all parties agree, the Seventh Circuit did not comment on FMC's damage theories. This court did address these theories and found that FMC was not damaged or injured by the recapitalization.... The [circuit] court did not hold that any of the specific damage theories ad-

vanced by FMC are viable. This court's prior finding that FMC itself was not damaged by the recapitalization was not reviewed. Thus this finding is not foreclosed by the Seventh Circuit's opinion.
   *Id.* at 1190–91.

5. *Id.* at 1199–1201.

FMC's restructure plan confidential and that such a duty was breached, and to decide on these assumptions whether FMC has any right to recover specific monetary damages from Goldman Sachs in the circumstances of this case.

An evidentiary hearing was held by this Court on April 6–8, 1993, pursuant to Rule 43(e) Fed.R.Civ.P.

By April 8, 1993, FMC had discovery since April 5, 1990 but had not repleaded its RICO claims (Counts VII and VIII of the Second Amended Complaint), which had been previously dismissed with leave to replead, as indicated above. By order dated April 8, 1993, this Court dismissed Counts VII and VIII of the Second Amended Complaint in pursuance of Rule 41(b), Fed.R.Civ.P., and, finding no just reason for delay, directed the entry of final judgment against FMC and in favor of Goldman Sachs on these counts.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56(c), Fed.R.Civ.P., provides that a district court shall grant a motion for summary judgment if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The task is not to resolve disputed issues of fact, but to "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To defeat summary judgment, however, material issues of fact must not merely be disputed, but must be "genuine," meaning they must have a real basis in the record.

The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact, but this burden may be met by demonstrating a lack of any evidence to support a non-moving plaintiff's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing summary judgment must then come forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. "[M]ere conjecture or

speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion." *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 42 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987).

Further, the Court may decline to consider offers of inadmissible evidence in its consideration of a motion for summary judgment. *United Air Lines, Inc. v. Austin Travel Corp.,* 867 F.2d 737, 742–43 (2d Cir.1989); *Argus Inc. v. Eastman Kodak Co.,* 612 F.Supp. 904, 908–09 (S.D.N.Y.1985), *aff'd,* 801 F.2d 38, 42 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). In sum, where "the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

## DISCUSSION

FMC has only two surviving theories for damages, (1) for "an amount equal to the value the misappropriated information had to FMC, which was at least what FMC paid to create it" and (2) for restitution of the $17.5 million fees paid to Goldman Sachs. These claims are discussed in turn in parts I and II below.

### I. Claim for Loss of Value of Confidential Information

To begin with, FMC's claim for the value to FMC of the type of information misappropriated is limited to *that value which was destroyed or otherwise diminished at the expense of the public shareholders by the alleged premature disclosure of that information.* As the Seventh Circuit stated in the earlier proceeding:

> FMC, if it can prove its allegations and satisfy the requirements of each specific cause of action it pursues, is entitled to recover in damages the best measure of the *value of the denial* of its exclusive use of the information.

*FMC Corp. v. Boesky,* 852 F.2d 981, 994 (7th Cir.1988) (emphasis added). So far as con-

cerns its confidential business information, FMC publicly disclosed all of that on April 2nd in its S–2 registration filing with the SEC, and again on May 2, 1986 to the stockholders directly in the prospectus for the stockholders meeting. Thus, the question here is what legally compensable value did FMC hold on behalf of its shareholders in keeping confidential prior to those dates information relevant to its planned restructure of the interests of its public and management shareholders in the corporate equity that was compromised by the alleged premature disclosure caused by Goldman Sachs' employees, and what is the best legal measure of that diminution in value of the information or plan as demonstrated by specific facts presented to the Court?

The exclusive use of the only information shown to have been leaked, that a possible recapitalization was in the works, unintentionally inured to the benefit—not the detriment—of the public shareholders, and the insiders commensurably shared the benefit of the rise and assertion of a stock price expressing the value of the equity. As elaborated below, FMC has failed to adduce any admissible evidence of specific facts that FMC sustained any increase in costs to it incurred to effectuate the restructure, or that any legitimate and legally cognizable value held by FMC in the financial information, which benefitted all its shareholders (at no cost to the company), was diminished in any way by premature disclosure. Correspondingly, the best measure of the compensable cost incurred by FMC or diminution in value of its plan is zero. FMC has thus failed to meet its evidentiary burden of adducing specific facts to evidence cognizable injury or damage to its shareholders or itself assertable against Goldman Sachs.

A careful consideration of the full record before the Court in the light most favorable to FMC plainly shows that: FMC **failed to adduce** admissible evidence of specific facts showing that FMC's stipulated "Confidential Information"—the business information—including projections were disclosed by Goldman Sachs to anyone before it became generally available to the public on April 2, 1986 by

the filing of the S–2 with the SEC; that any notion of misappropriated business information caused damage or impairment of the plan; that any legitimate object of FMC as a whole was defeated or impaired; that the price paid by FMC to its own shareholders for the restructure was anything other than a fair price established by the open market; that the cost of the plan to FMC was increased by any payment for the benefit of an outsider; that the corporate fiduciaries, the management shareholders had a legitimate and legally cognizable interest in shortchanging the public shareholders in the restructure and achieving a windfall profit for themselves, by maintaining in confidence business information pertinent to the fair value of the stock; or that the alleged confidential information was diminished in value at the expense of the corporation by premature disclosure. None of these were shown to exist. There is no indication of the existence of any admissible evidence that Brosens' conversations with Lessman breached confidentiality of business information entrusted to Goldman Sachs. The letter agreement's confidentiality provision was designed to protect corporate financial information that Goldman Sachs obtained from FMC. Brosens' assessment of the market's reaction to a restructure of FMC's equity ownership and any discussion thereof was not the bargained for confidential business information provided to Goldman Sachs by FMC.

An understanding of the essential economic nature of FMC's recapitalization transaction is crucial to the proper resolution of the issues before the Court. In essence, the transaction was intended to increase the proportion of FMC's equity held by management and to correspondingly decrease that proportion held by public shareholders. This would be achieved by returning to public shareholders, through cash payments, a fraction of their equity investment in FMC while leaving intact and unchanged management's equity investment, the result being, of course, that management would end up with a larger proportionate share of the reduced total equity investment in FMC.[6]

---

**6.** As the cash payments were financed by debt,

FMC thus essentially replaced a portion of its

The transaction would be fair to all·parties if and only if the public shareholders received in cash the fair value of the equity they were asked to give up measured by open market values. If they received more than the fair value of the equity given up, they would benefit at the cost of management. If they received less than the fair value of the equity given up, they would be disadvantaged to the benefit of management. FMC's claim suggests that it was harmed because its shareholders received too much—a remarkable proposition that was twice soundly rejected by the District Court in Chicago prior to the transfer to this Court. As Judge Williams pointed out, "the transaction essentially is an instance of self-dealing" between management and public shareholders. *FMC Corp. v. Boesky*, 673 F.Supp. 242, 250 (N.D.Ill.1987).

Boesky's purchases of FMC stock as the market price advanced wiped out any premium in the deal price over the market price that the management shareholders expected would exist in their favor over the interests of the public shareholders. No admissible evidence was presented by FMC that the pre-transaction market price of FMC stock was artificially high and did not represent the stock's true fair value nor was there any other indication by specific fact that the recapitalization overcompensated FMC's public shareholders for the equity they gave up. Further, all shareholders, including the management shareholders, shared in the benefits of the rise in price of FMC's stock.[7] As stated by the Supreme Court, "where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded." *Bangor Punta Operations, Inc. v. Bangor Aroostock Co.*, 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974).

The new FMC shares which were projected under the revised recapitalization to trade at about $17.14 per share opened actually at $19.25. This unerringly suggests that the projected price was in fact a slight undervaluation of the true fair value of FMC stock and not inflated. Where "the factual context renders [plaintiffs'] claim implausible—if the claim is one that simply makes no economic sense—[plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). FMC's bald assertion that the market price of FMC stock was artificially high in April, 1986, because of Boesky's buying program falls far short of this standard and is unsupported by specific facts.

Boesky may have reaped illegal profits in trading on the non-public information that a recapitalization was brewing, and he was sued by FMC therefor and settled in cash with FMC. But the only other parties who suffered legally cognizable injury would be those who bought or sold securities with Boesky directly, or even indirectly through the market,[8] not FMC, whose recapitalization was neither executed on the market nor approved by FMC's shareholders until May 22, 1986, well after the non-public information had been publicly disclosed by FMC itself: first on April 2nd when it publicly filed its Form S-2 with the SEC and again on May 2nd when it publicly issued its joint proxy statement/prospectus. *See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,377, at 98,878, 1975 WL 437 (S.D.N.Y.) (liability in Rule 10b–5 action limited to period of time from defendants' trades to the public disclosure of the insider information). *See also Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94 (2d Cir.1981) (in Rule 10b–5 liability, "duty of disclosure is owed only to those investors

---

equity with debt.

7. As Judge Williams has pointed out, FMC has made no claims that management was disadvantaged by the transaction. *FMC Corp. v. Boesky*, 673 F.Supp. at 251 ("FMC makes no claim that management suffered an injury").

8. *See e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir.1974) (For Rule 10b–5 liability, "defendants owed a duty ... [to disclose] not only to the purchasers of the actual shares sold by defendants ... but to all persons who during the same period purchased Douglas stock in the open market without knowledge of the material · inside information....").

trading contemporaneously with the insider").

■ The value to FMC of keeping the financial information confidential until April 2, 1986—allowing FMC to consummate a recapitalization at $10 per share less than what eventually proved to be a fair price for the public shareholders' stock—is not a legitimate and legally cognizable value for which FMC may seek legal recourse. FMC's insiders were not privileged to appropriate confidential corporate information for their own benefit, and to the detriment of public shareholders. "Corporate insiders . . . have an obligation to place the shareholder's welfare before their own. . . ." *Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115–16, 63 L.Ed.2d 348 (1980).

The issue under the specific factual context of this case seems to be one of first impression. Plaintiff's claim seems to stem from inapplicable concepts in a series of suits, growing out of the insider trading epidemic of the 1980's, where successful purchasers in take-over transactions have sued investment banks and other agents and intermediaries, on grounds that the defendants were furnished with confidential information and traded thereon, or otherwise misappropriated this information for their own gain, and that the trading or other misappropriation drove up the market price of the target company's stock causing the acquirers to pay more for the acquisitions than they otherwise would have had to. *See, e.g., Litton Indus. v.*

*Lehman Bros. Kuhn Loeb, Inc.*, 86–CV–6447 (S.D.N.Y. filed Aug. 19, 1986); *Anheuser–Busch Cos. v. Thayer*, No. CA3–85–0794–R (N.D.Tex. filed Apr. 26, 1985).[9] This is not one of these cases.[10]

Certainly, courts have recognized that corporations and their management are under no general duty to disclose and may in certain circumstances keep confidential from the public such "soft information" as future performance projections and internal valuations. *See, e.g., Gerstle v. Gamble–Skogmo, Inc.*, 478 F.2d 1281, 1291–94 (2d Cir.1973); *Kademian v. Ladish Co.*, 792 F.2d 614, 625 (7th Cir.1986); *Starkman v. Marathon Oil Co.*, 772 F.2d 231 (6th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). The SEC has not required the disclosure of soft information because of concerns that such information can be unreliable, may be misunderstood or misinterpreted by investors, and thus is especially susceptible to abuse by issuers. *See* Bruce A. Hiler, *SEC, Courts, and Soft Information*, 46 Md. L.Lev. 1114, 1114–16 (1987). In this case, FMC has asserted precisely these interests to justify its practice of not disseminating future-looking information in the ordinary course of its business, that is, because such information would be susceptible to fostering harmful rumor and speculation.

■ However, the goal of the federal securities laws is "to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through

**9.** *See* Manning Gilbert Warren III, *Who's Suing Who? A Commentary on Investment Bankers and the Misappropriation Theory*, 46 Md.L.Rev. 1222, 1228 & n. 38 (1987) (describing the instant case and *Litton* as "variant[s] of a pattern"); Jeanne M. Hauch, Note, *Insider Trading by Intermediaries: A Contract Remedy for Acquirers' Increased Cost of Takeovers*, 97 Yale L.J. 115 (1987) (arguing that "an acquirer who entrusts confidential information to an intermediary [such as an investment bank] should recover damages from the intermediary firm for breach of contract when insider trading by the firm's agents based on the confidential information increases the cost of the takeover," because, *inter alia*, "acquirers will be more likely to incur sunk costs to obtain information leading to value-increasing business combinations if they believe there is a significant chance that they will be made whole should their information be misused," and "[a] small amount of insider trading and tipping can disseminate

information widely in the market, eroding the opportunity for gain which the acquirer has identified").

**10.** *See also* Bruce A. Hiler, *SEC, Courts, and Soft Information*, 46 Md.L.Lev. 1114, 1167–72 (1987) (noting distinction between disclosure obligations of insiders and outsiders). Valuable corporate information is held by a corporation and its insiders in a fiduciary capacity for the benefit of shareholders. Indeed, it is the duty of a corporation and its management, it is their *raison d'etre*, to develop such information to maximize shareholder value and to use such information in furtherance of shareholder interests. No additional incentive is required, and the corporation may not assert that it was compelled to make expenditures to safeguard the interests of its stockholders.

the mails, and to prevent frauds in the sale thereof." Securities Act of 1933, 15 U.S.C. §§ 77a–77mm (1982) (preamble). In furtherance of this goal, and in recognition that market professionals have long found soft information relevant and important to informed investment decisions, SEC has encouraged, without requiring registered companies to supply forward-looking information. Guides for Disclosure of Projections for Future Economic Performance, Securities Act Release No. 5992, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 81,756 (Nov. 7, 1978). Thus, it is patent that the SEC policy in not generally requiring the disclosure of soft information is motivated by concerns for the public investor and does not amount to a tacit recognition that corporations and management may hold—and realize—any legitimate value in confidential corporate soft information to the detriment of public shareholders and investors. Corporate information, like all corporate assets, ultimately belongs to shareholders as equity owners of the corporation. The SEC policy does not change the principle that the only legitimate value a corporation or its management may hold in keeping any information confidential is in a fiduciary capacity for the benefit of its public investors and shareholders. *See* Bruce A. Hiler, *SEC, Courts, and Soft Information,* 46 Md.L.Lev. 1114, 1114–16, 1123, 1171 (1987) (in "the usual types of cases in which soft information is at issue, one can say generally that when issuers or insiders are involved in a transaction with shareholders, such as a leveraged buyout or a merger that they recommend to stockholders, they will have a duty to disclose material facts to which they have access"). FMC's fiduciary interest is not being required to disclose soft information thus does not affect the conclusion that FMC may not seek damages where the information is leaked but the leak did not lead to injury to shareholders but rather benefitted them.

This is not a case where valuable corporate secrets were destroyed by misappropriation or unauthorized disclosure, which otherwise could and would have been kept confidential indefinitely, and of which any potential unrealized value was thus destroyed. As indicated above, the revised recapitalization was consummated on May 28, 1986. By all objective criteria, the transaction was successful and met all of FMC's legitimate objectives. FMC has adduced no admissible evidence to the contrary. FMC has not suggested any legitimate value, and has adduced no admissible evidence of such value, which was not fully realized in the successful consummation of the recapitalization. FMC's legitimate use of the information to plan, structure, and consummate a recapitalization that is fair to all parties was not compromised by premature disclosure that a plan might be in the offing or of its financial backdrop, and no compensable interest of FMC failed to be realized but was destroyed or diminished by premature disclosure.

## II. Claim for Rescission of Goldman Sachs' Fee

■■ FMC's first theory for the recovery of the $17.5 million fee it paid to Goldman Sachs is fraudulent inducement or breach of contract. There is no material issue of fact here that the goal and purpose FMC's engagement of Goldman Sachs, formalized in the Letter Agreement, was the successful consummation of a so called recapitalization transaction which met certain of FMC's criteria. Important as the preservation of confidentiality might have been to FMC's management, there is no doubt that it was ancillary to this principal objective. As discussed above, by all objective measures, all of FMC's legitimate goals in consummating a transaction that was both fair to its shareholders and that met its strategic business requirements were successfully achieved. Where the alleged breach is of an ancillary obligation, rescission is not an available remedy. As the Second Circuit has put it, "before rescission will be permitted the breach must be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract,'" *Septembertide Publishing, B.V. v. Stein and Day, Inc.* 884 F.2d 675, 678 (2d Cir.1989) (quoting *Callanan v. Powers,* 199 N.Y. 268, 92 N.E. 747 (1910). "As an extraordinary remedy, rescission is appropriate only when a breach may be said to go to the root of the agreement

between the parties." *Id. Accord Canfield v. Reynolds,* 631 F.2d 169, 178 (2d Cir.1980); *Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co.,* 513 F.2d 1183, 1186 (2d Cir.1975); *Croce v. Krunit,* 565 F.Supp. 884, 894 (S.D.N.Y.1982), *aff'd,* 737 F.2d 229 (2d Cir.1984); *Nolan v. Williamson Music Co.,* 300 F.Supp. 1311, 1317 (S.D.N.Y. 1969), *aff'd sub nom. Nolan v. Sam Fox Publishing Co., Inc.,* 499 F.2d 1394 (2d Cir. 1974)). In addition, in *Croce* this court held that rescission was inappropriate because the defendant's breach of fiduciary duty did not defeat the purpose of the contract. *Croce* 565 F.Supp. 884.

■ Moreover, rescission is not an available remedy where, as here, plaintiff has realized and paid for the full benefit of the contract. *See Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 43, 280 N.E.2d 867, 877 (1972); *Schank v. Schuchman,* 212 N.Y. 352, 106 N.E. 127 (1914) (Cardozo, J.). There are no obvious means to undo the entire restructure transaction, nor has FMC sought such a remedy. As this court stated in *Stahl Management Corp. v. Conceptions Unlimited,* 554 F.Supp. 890, 894 (S.D.N.Y.1983), "[u]sually, rescission may be obtained only when it is reasonably feasible to return the parties to their pre-contract status quo." FMC is thus not entitled rescission and restitution of Goldman Sachs' $17.5 million fee. "Absent grounds for rescission ... [plaintiff] has only the right to compensatory damages for breach of the agreement," *Affiliated,* 513 F.2d at 1186, of which, as discussed above, plaintiff did not suffer any in this case. *See also Babylon Associates v. County of Suffolk,* 101 A.D.2d 207, 475 N.Y.S.2d 869, 874 (1984) (plaintiff not entitled to rescission of contract and restitution for all sums paid thereunder to defendant construction contractor where contractor's breach was caused by subcontractor's illegal conduct and "it is clear that [contractor's] breach .... was not willful since ... contractor neither had knowledge nor participated in the subcontractor's criminal activity.").

■ FMC's second theory for the recovery of the $17.5 million fee it paid to Goldman Sachs is for breach of fiduciary duty.

Plaintiff is entitled to the forfeiture of Goldman Sachs fee only if Goldman Sachs was not merely negligent but had violated its duty of loyalty to plaintiff by placing its own interest, or that of another, before that of plaintiff. *Battle Fowler v. Brignoli,* 765 F.Supp. 1202 (S.D.N.Y.), *aff'd mem.,* 952 F.2d 393 (2d Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1587, 118 L.Ed.2d 305 (1992). The Court finds on the record as a whole, in the light most favorable to FMC, that Goldman Sachs was at most guilty of negligence and that FMC has adduced no admissible evidence that Goldman Sachs had violated its duty of loyalty. As indicated above, FMC has conceded that it was not within the scope of Brown's employment by Goldman Sachs to disclose confidential client information, that there is no evidence Goldman Sachs had any knowledge that Brown had been engaging in such conduct, and that Brown knew his conduct violated Goldman Sachs' policies on client confidentiality. FMC has failed to adduce any evidence that Goldman Sachs realized any monetary or other direct benefit from either Brown's misbehavior or from Brosens' alleged disclosures. FMC's vague allegations, entirely unsupported by admissible evidence, that Goldman Sachs benefitted indirectly from participating in an amorphous network involving other members of the Wall Street community are at best no more than a showing "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "A party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.,* 709 F.Supp. 438 (S.D.N.Y.1989) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986)), *rev'd on other grounds,* 967 F.2d 742 (2d Cir.1992). Goldman Sachs is thus entitled to and is hereby separately granted summary judgment against FMC on its claim for forfeiture of Goldman Sachs' fee.

In summary, for the foregoing reasons, the Court finds on the record as a whole in the light most favorable to FMC that FMC has failed, on Goldman Sachs' motion for sum-

mary judgment, to adduce sufficient admissible evidence of specific facts to sustain its complaint. The action is accordingly dismissed with costs.

So Ordered.