T.C. Memo. 2001-298

UNITED STATES TAX COURT

FMC CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2317-00.                    Filed November 8, 2001.

        P paid the investment banking firm of Goldman,
Sachs & Co. (G) approximately $17.5 million to advise
it financially on a recapitalization.  One of G's
employees disclosed non-public information on the
recapitalization to various Wall Street professionals,
including IB.  IB traded P's stock on the basis of this
non-public information.  P first announced that it
would redeem each share of P stock held by the public
in exchange for cash of $70 and one share of stock in
the new company.  P later increased the cash payment to
$80 per share and effectuated the recapitalization at
that price.  P's cash payment under the revised plan,
less the cash payment which it would have made under
the original plan, equaled $217,649,340.  Subsequently,
P sued G, IB, and others in a Federal District Court in
Illinois alleging, among other things, that they were
responsible for the increased cash payment.  The
District Court dismissed the complaint in full but the
Court of Appeals for the Seventh Circuit reversed.
Upon remand, the district court dismissed the complaint

for failure to state a claim, but only in part. After the case was transferred to a Federal District Court in New York, all of the defendants, except G, settled. The court later granted G's motion for summary judgment and the Court of Appeals for the Second Circuit upheld the judgments by both District Courts. P claimed a $217,649,340 theft loss deduction on its 1994 Federal income tax return.

Held: P is collaterally estopped from claiming that it sustained a theft loss by virtue of the additional cash payment of $217,649,340. The disposition of the prior action in G's favor rested on findings that P redeemed its stock for no more than it was worth and thus sustained no cognizable injury from the disclosure of the confidential information.

F. Brook Voght and David B. Blair, for petitioner.

Lawrence C. Letkewicz, for respondent.

MEMORANDUM OPINION

LARO, Judge: Petitioner petitioned the Court to redetermine respondent's determination of a $2,030,589 deficiency in its 1994 Federal income tax. Petitioner's sole assignment of error concerns respondent's disallowance of a $217,649,340 theft loss deduction claimed for that year. Petitioner alleged in its petition that the theft loss related to the fraudulent and illegal activities of Ivan F. Boesky (Boesky), which caused petitioner to redeem its stock (old FMC stock) at an artificially increased price.

Respondent moves the Court to adjudicate this case summarily under Rule 121,[1] asserting that petitioner is collaterally estopped from proving that it is entitled to such a loss. Respondent bases his motion on the pleadings and the parties' stipulation of facts and accompanying exhibits. Respondent supports his motion with a memorandum of law.

Petitioner objects to respondent's motion. Petitioner asserts that collateral estoppel does not apply in this case. Petitioner embodied its objection in a brief that it filed with the Court in response to respondent's motion.

We agree with respondent that petitioner is collaterally estopped from claiming the referenced theft loss. We set forth our reasoning below.

### Background

The parties have stipulated facts and exhibits for purposes of this case. We have derived most of the facts set forth in this background section from that stipulation of facts and those accompanying exhibits. We have derived the remaining facts from the pleadings. See Rule 36(c).

Petitioner is a Delaware corporation whose principal place of business was in Chicago, Illinois, when its petition was filed. From January through June 1984, its stock (the old FMC

---

[1] Unless otherwise indicated, Rule references are to the Tax Court Rules of Practice and Procedure.

stock) traded at between $41 7/8 and $48 5/8 per share.  In August 1984, following its redemption of 8.3 million shares (approximately 25 percent) of old FMC stock at an average price of approximately $54 per share, old FMC stock traded at approximately $60 per share.

In early 1985, petitioner retained the investment banking firm of Goldman, Sachs & Co. (Goldman) to advise it financially on a possible corporate restructuring.  Goldman implemented its normal procedures for maintaining the confidentiality of information relating to petitioner, including assigning petitioner's project with a code name.  Petitioner agreed to pay Goldman a fee of approximately $17.5 million upon consummation of any restructuring.

David S. Brown (Brown) was a Goldman employee who was not assigned to petitioner's project.  Unbeknownst to Goldman, Brown had been providing non-public information on pending transactions to a number of individuals, including Boesky, Ira Sokolow (Sokolow) of Shearson Lehman Bros., Inc. (Shearson), and Dennis Levine (Levine) of Drexel Burnham Lambert (Drexel).  While working for Goldman, Brown learned that petitioner was considering a major transaction and passed on that information to Sokolow.  Sokolow passed on the information to Levine, and Levine passed on the information to Boesky.

From February 18 through 21, 1986, Boesky and his affiliated entities purchased 105,300 shares of old FMC common stock, accounting for approximately 15 percent of the stock's trading volume during that period. The stock opened at $71 3/4 per share on February 18, 1986, and it traded at a high of $82 per share on the morning of February 21, 1986. During that morning, petitioner asked the New York Stock Exchange to suspend trading of its stock and announced that it was considering a recapitalization.

The next day, petitioner announced that its board of directors (board) had approved a plan of recapitalization (first plan) under which it would purchase: (1) Each share of old FMC stock held by its management for 5.667 shares of common stock (new FMC stock) in the recapitalized company, (2) each share of old FMC stock held by its thrift plan for four shares of new FMC stock and $25 cash, and (3) each share of old FMC stock held by public shareholders for one share of new FMC stock and $70 cash. Pursuant to the first plan, petitioner would purchase approximately 20 percent of its ownership from public shareholders. Goldman had opined as to those shareholders that they would receive under the first plan fair consideration for their shares.[2] Goldman believed that each share of new FMC stock

---

[2] Morgan Stanley & Co. (Morgan Stanley) also rendered a similar opinion.

was worth $15 and that each holder of old FMC stock would receive consideration of $85 per share. Old FMC stock reopened for trading on February 24, 1986, and it closed that day at $87 1/2.

During the week of February 24, 1986, holders of old FMC stock filed three purported class action lawsuits against petitioner and each of its directors in the Court of Chancery of the State of Delaware. The complaints alleged, among other things, that the first plan permitted petitioner's management and employees to increase their ownership of the company at a low and unfair price.

From March 3 through April 4, 1986, Boesky and various entities controlled by him purchased 1,922,000 shares of old FMC stock, nearly 35 percent of the stock's trading volume during that period. On April 7, 1986, Boesky filed a Schedule 13D with the Securities and Exchange Commission (SEC) disclosing these purchases.

By mid-April, old FMC stock was trading in the range of $95 to $97 per share. During the week of April 21, 1986, Goldman advised petitioner that, due to the increase in the price of old FMC stock, Goldman would withdraw its fairness opinion unless petitioner either increased the cash paid to public shareholders or decreased the number of shares of new FMC stock paid to management and the thrift plan. Petitioner did not consider reducing the number of shares of new FMC stock paid to management

and the thrift plan as a viable option because, among other things, petitioner wanted the recapitalization to effect a 20-percent shift in ownership so that the public shareholders could treat their cash distributions as capital gains rather than as dividends.

Due to the increased trading price for old FMC stock, and on the advice of Goldman, Morgan Stanley, Morgan Guaranty Trust Company (Morgan Guaranty), and outside counsel, petitioner's board approved on April 26, 1986, a revised plan of recapitalization (revised plan) which increased the cash payment to public shareholders to $80 per share. Goldman now believed that each share of new FMC stock was worth $17.14 (instead of $15) and that each holder of old FMC stock would receive the equivalent of $97.14. Petitioner announced the revised plan on April 28, 1986. Approximately 2 days before, the plaintiffs in the purported class action lawsuits agreed to resolve their claims subject to, among other things, payment to them of $1 million and the revision of the first plan.

Both Goldman and Morgan Stanley opined to petitioner's board, by letters dated April 26, 1986, and April 27, 1986, respectively, that the consideration to be received by public shareholders under the revised plan was fair. The revised plan was approved by petitioner's shareholders at the annual meeting held on May 22, 1986, and petitioner completed the

recapitalization 6 days later.  Public shareholders received $80 cash and one share of new FMC stock for each share of old FMC stock.  The cash payment made by petitioner under the revised plan, less the cash payment which it would have made under the first plan, equaled $217,649,340 (21,764,934 shares multiplied by the $10 difference between $80 and $70).

Petitioner had obtained preliminary financing for the first plan with a consortium of banks, led by Morgan Guaranty.  With the additional $217,649,340 in cash required for the revised plan, the banks revised the terms of the loans to impose restrictive covenants on petitioner and refused to fund the additional cash payment, so that petitioner had to raise the funds through a senior subordinated debt offering.  The change in financing also led the rating agencies to downgrade petitioner's debt.

On November 14, 1986, the SEC filed a Complaint for Injunctive and Other Equitable Relief against Boesky in the U.S. District Court for the Southern District of New York.  The complaint alleged that Boesky was part of a trading scheme in which Brown, Sokolow, Levine, and others gathered material non-public information on pending business combinations or other extraordinary transactions.  The complaint alleged that Levine conveyed this information to Boesky, who traded on the basis of the information knowing, or recklessly disregarding, that the

information had been obtained in breach of fiduciary obligations to keep the information confidential. The complaint alleged that, on the basis of material non-public information that Boesky had obtained through this trading scheme, Boesky had traded in the securities of certain companies, including, from February 18 to 21, 1986, petitioner. Boesky settled this complaint, agreeing to pay a $50 million fine, to disgorge another $50 million in profits from his illegal activities, to refrain from further violations of the securities laws, and to cooperate in a Federal investigation into his and others' illegal activities.

In December 1986, petitioner filed a 16-count complaint (Complaint) in U.S. District Court for the Northern District of Illinois against Boesky, Brown, Levine, Sokolow, Goldman, Drexel, and Shearson (collectively, defendants). Counts I through V alleged violations of Federal securities laws. Counts VI through VIII alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. sections 1961 and 1964(c). Counts IX through XVI alleged violations of common law. All sixteen counts alleged that petitioner had suffered damages in excess of $235 million. Paragraph 64 of the Complaint alleged as "Adverse Financial Consequences to FMC":

> As a direct and proximate result of the illegal conduct alleged herein, FMC paid approximately $220 million more for the publicly held common stock of FMC tendered in response to FMC's purchase offer than FMC would have paid absent the illegal conduct.

The District Court (Judge Ann C. Williams, presiding) dismissed the Federal claims set forth in the Complaint, holding that petitioner lacked the requisite constitutional standing to sue, and refused to exercise pendant jurisdiction over the State law claims. FMC Corp. v. Boesky, 673 F. Supp. 242 (N.D. Ill. 1987). The Court of Appeals for the Seventh Circuit reversed, holding that petitioner had the requisite standing to sue in Federal court by virtue of the wrongful misappropriation of its confidential business information and the use of that information to further insider trading. FMC Corp. v. Boesky, 852 F.2d 981 (7th Cir. 1988). Subsequently, on or about September 23, 1988, petitioner filed a first amended complaint (First Amended Complaint) containing 16 counts, all of which alleged again that petitioner suffered damages in excess of $235 million. Paragraph 64(b) of the First Amended Complaint alleged as "Adverse Financial Consequences to FMC" that

> The price of FMC's common stock was wrongfully manipulated, causing FMC to revise its planned recapitalization and pay approximately $220 million more in cash than FMC would have paid for its publicly held common stock, tendered in response to FMC's offer to purchase Old FMC Stock and to sell New FMC Stock; * * *

Upon remand, the District Court dismissed, with prejudice, for failure to state a claim, petitioner's claims under the securities laws, holding that petitioner had failed to establish that it suffered any actual economic damages from the defendants'

use of insider information.  FMC Corp. v. Boesky, 727 F. Supp. 1182 (N.D. Ill. 1989).  The court also dismissed, without prejudice, Goldman, Shearson, and Drexel from two of the three RICO counts.  The court denied the defendants' motion to dismiss the remaining claims, all of which were made against the individual defendants and the Boesky entities, or concerned petitioner's pendant State law claims.  Id. at 1185, 1201.

On April 11, 1990, the Judicial Panel on Multi-District Litigation transferred the case of FMC Corp. v. Boesky, supra, to Senior District Judge Milton Pollack (Judge Pollack) of the U.S. District Court for the Southern District of New York to coordinate or consolidate pretrial proceedings in In re Ivan F. Boesky Sec. Litig., MDL No. 732.  All of the defendants, except for Goldman, ultimately settled with petitioner.  Boesky and his entity, CX Partners, agreed to pay petitioner $3 million plus interest from amounts that CX Partners received from Boesky's disgorgement fund, and Shearson agreed to pay petitioner $540,000.  Brown, Levine, Sokolow, and the other defendants were insolvent, but agreed to cooperate with petitioner.  On December 10, 1992, upon motion by the SEC, the U.S. District Court for the Southern District of New York approved payment of $6,742,685 from Boesky's disgorgement fund to CX Partners, of which $3 million plus interest was to be paid to petitioner in satisfaction of the settlement agreement.  On December 30, 1996,

the U.S. District Court for the Southern District of New York approved a plan of distribution from Boesky's disgorgement fund to persons who sold old FMC stock from February 18 through April 4, 1986.

On or about August 5, 1992, petitioner filed a second amended complaint (Second Amended Complaint). The Second Amended Complaint generally contains the same 16 counts as the Complaint and the First Amended Complaint, plus an additional common law count. The Second Amended Complaint notes that petitioner's securities law counts and its allegation that petitioner sustained damages in excess of $235 million had been dismissed but were alleged again to preserve petitioner's rights to seek reconsideration of that dismissal and to appeal. Paragraph 94(b) of the Second Amended Complaint alleges as "Adverse Financial Consequences to FMC" that

> The price of FMC's common stock was wrongfully manipulated, causing FMC to revise its initial recapitalization plan and pay approximately $220 million more in cash than FMC would have paid for its publicly held common stock, tendered in response to FMC's offer to purchase Old FMC Stock and to sell New FMC Stock * * *

Subsequently, at the direction of Judge Pollack, petitioner filed a revised Second Amended Complaint, omitting claims that had previously been dismissed or settled.

On September 11, 1992, Goldman moved for summary judgment on all of petitioner's remaining claims. For the limited purpose of

that motion, Goldman agreed that it had a contractual, fiduciary, or other duty to petitioner to keep information relating to its restructuring plan confidential and that this duty had been breached. After a 3-day evidentiary hearing, held under Rule 43(e) of the Federal Rules of Civil Procedure, the court granted Goldman's motion for summary judgment on the remaining claims against Goldman. See FMC Corp. v. Boesky, 825 F. Supp. 623 (S.D.N.Y. 1993). Upon appeal, the Court of Appeals for the Second Circuit upheld the judgments of the U.S. District Courts for the Northern District of Illinois and the Southern District of New York. See FMC Corp. v. Boesky, 36 F.3d 255 (2d Cir. 1994). That judgment became final during 1994.

On its 1994 Federal income tax return, petitioner claimed a theft loss deduction of $217,649,340. Respondent disallowed this deduction in full.

## Discussion

We must decide whether petitioner is collaterally estopped from proving that it is entitled to deduct the claimed theft loss. Respondent moves the Court to decide this issue summarily, asserting that collateral estoppel prevents petitioner from deducting such a loss. Petitioner objects to respondent's motion. Petitioner asserts that two elements of collateral estoppel have not been met. First, petitioner argues, the factual and legal issues presented here are different from the

issues presented in petitioner's prior case against Goldman. Second, petitioner argues, the issue of whether it suffered a theft loss on account of the insider trading of Boesky and his co-conspirators (collectively, Boesky) was not actually litigated in the prior case because, petitioner contends, the issue was not necessary to a holding there.

Summary judgment is intended to expedite litigation and to avoid unnecessary and expensive trials of phantom factual issues. P & X Mkts., Inc. v. Commissioner, 106 T.C. 441, 443 (1996), affd. without published opinion 139 F.3d 907 (9th Cir. 1998); Boyd Gaming Corp. v. Commissioner, 106 T.C. 343, 347 (1996). The concept of summary judgment is specifically recognized by this Court and is deeply ingrained in our procedural rules. See Rule 121(a) ("Either party may move, with or without supporting affidavits, for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy"). A decision on the merits of a taxpayer's claim can be made through summary judgment "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); see also Zaentz v. Commissioner, 90 T.C. 753, 754 (1988). Because summary judgment decides against a party before trial, we grant

such a remedy cautiously and sparingly, and only after carefully ascertaining that the requirements for summary judgment have been met. P & X Mkts., Inc. v. Commissioner, supra at 443; Boyd Gaming Corp. v. Commissioner, supra at 346-347. Among the principles relevant to summary judgment are: (1) The moving party must show the absence of any material fact in dispute and that it is entitled to judgment as a matter of law; (2) the factual materials and resulting inferences must be viewed in the light most favorable to the opposing party; and (3) the opposing party must set forth specific facts to show a genuine issue of material fact for trial and cannot rest upon mere allegations or denials. Brotman v. Commissioner, 105 T.C. 141, 142 (1995).

Collateral estoppel may apply in Federal tax cases, Commissioner v. Sunnen, 333 U.S. 591, 598 (1948), and summary judgment may be used to establish matters covered by collateral estoppel, Brotman v. Commissioner, supra at 142. If collateral estoppel applies, issues which were litigated and decided in an earlier case on one cause of action may not be relitigated by the parties or their privies on a different cause of action. Montana v. United States, 440 U.S. 147, 153 (1979); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979); Commissioner v. Sunnen, supra at 597. Collateral estoppel conserves judicial resources and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. Montana v. United States,

supra at 153-154; Meier v. Commissioner, 91 T.C. 273, 282-284 (1988).

Collateral estoppel applies when six conditions are met. First, the issue in the later case must be identical in all respects to the issue decided in the prior case. Commissioner v. Sunnen, supra at 599-600; Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990). Second, a final judgment must have been rendered in the prior case by a court of competent jurisdiction. Peck v. Commissioner, supra at 166; Gammill v. Commissioner, 62 T.C. 607, 613 (1974). Third, collateral estoppel must be asserted in the later case against a party to the prior case or against a privy to that party. Peck v. Commissioner, supra at 166-167; Gammill v. Commissioner, supra at 614-615; see also Parklane Hosiery Co. v. Shore, supra (mutuality of parties is not necessary for collateral estoppel). Fourth, the issue in the later case must be one that the parties to the prior case actually litigated and that was essential to the prior decision. Commissioner v. Sunnen, supra at 598, 601; Peck v. Commissioner, supra at 166-167. Fifth, the controlling facts and legal principles must remain unchanged from the prior litigation. Commissioner v. Sunnen, supra at 599-600; Peck v. Commissioner, supra at 166-167. Sixth, no special circumstances exist that would warrant the trial court in the later case to exercise its discretion to find an exception to the normal rules

of preclusion.  <u>Montana v. United States</u>, <u>supra</u> at 162; <u>Meier v.
Commissioner</u>, <u>supra</u> at 291-292.

Petitioner acknowledges that the satisfaction of these six
conditions would lead to the application of collateral estoppel.
Petitioner focuses solely on the first and fourth elements,
arguing that these two elements have not been met.  Petitioner
argues that:  (1) The factual and legal issues here are different
than those issues in its case against Goldman, and (2) the issue
of whether it suffered a theft loss on account of Boesky's
insider trading was not actually litigated in the prior case
because, it contends, that issue was not necessary to a holding
there.  We address these two elements seriatim and then turn to
the sixth element concerning our discretion to find an exception
for special circumstances.

1.  <u>Similarity of Issues</u>

Petitioner argues that the factual and legal issues here are
fundamentally different from those in its prior case.  Petitioner
asserts that the cases are different factually in that the prior
case decided only its limited claims against Goldman, whereas the
current case centers on the actions of Boesky in the context of a
Federal income tax deduction.  Moreover, petitioner asserts, the
cases are factually different in that the prior case did not
concern the current issue of whether the value of old FMC stock
was artificially inflated by Boesky's illegal actions.  As to the

difference in legal issues, petitioner asserts, the prior decision rested primarily on the legal conclusion that petitioner and its shareholders were a single economic unit.  Petitioner asserts that a corporation and its shareholders are not a single economic unit for purposes of this case.

We reject petitioner's argument that the issue at hand was not at issue in its prior case.  Although we agree with petitioner that its theft loss deduction for Federal income tax purposes was not at issue there, the focus of collateral estoppel is set appropriately on the identity of issues and not on the identity of legal proceedings.  Collateral estoppel may apply to an issue of fact (or law) that was litigated in a prior action even though that litigation related to a claim that is absent from the current case.  Brotman v. Commissioner, 105 T.C. at 148; Bertoli v. Commissioner, 103 T.C. 501, 508 (1994).

Our decision as to the validity of petitioner's claimed theft loss deduction requires that we find the value of the old FMC stock at the time of petitioner's recapitalization.  See sec. 1.165-8(c), Income Tax Regs.  The courts in petitioner's prior case against Goldman also had to make that factual determination in order for them to decide petitioner's claim for damages. Contrary to petitioner's assertion, the fact that the courts in the prior case did not decide a specific claim against Boesky does not prevent this Court from applying collateral estoppel to

the facts at hand.  Our application of collateral estoppel is driven by the critical fact that the other courts had before them the value of the old FMC stock at the time of petitioner's recapitalization and that we have the same issue here.

Our conclusion that the value of the old FMC stock was and is at issue in the respective cases is supported by our reading of the relevant allegations in petitioner's pleadings in the respective cases.  Petitioner's current allegations as to the theft loss are in all material respects the same as its corresponding prior allegations as to damages.  The petition alleges as to the claimed theft loss that:  (1) Boesky obtained confidential information about its recapitalization and made a series of large, illegal trades in old FMC stock, (2) "Boesky's illegal activities manipulated the price of FMC shares by artificially increasing it through market misinformation," including the filing of a false Schedule 13D, and (3) "the increased share price damaged FMC by fraudulently causing management to revise the recapitalization plan and pay out $217,649,340 of additional cash."  The petition alleges further that Boesky's illegal conduct artificially inflated the price of old FMC stock, causing petitioner to revise the first plan and to pay to its shareholders $217,649,340 more than it had originally planned.

The prior pleadings, in turn, allege as to damages that: (1) The conduct of Boesky, Goldman, and others in connection with the recapitalization violated both securities law and RICO; (2) Boesky defrauded petitioner; (3) Boesky induced or participated in a breach of fiduciary duty by Goldman; (4) Boesky wrongfully interfered with petitioner's contractual relationship with Goldman; and (5) Boesky, together with Goldman, misappropriated petitioner's business and proprietary information and wrongfully interfered with its prospective economic relationship with its shareholders.[3]  The First Amended Complaint alleges (and the other prior pleadings allege similarly) that petitioner's damages resulting from the illegal conduct of the defendants include that

> The price of FMC's common stock was wrongfully
> manipulated, causing FMC to revise its planned
> recapitalization and pay approximately $220 million
> more in cash than FMC would have paid for its publicly
> held common stock, tendered in response to FMC's offer
> to purchase Old FMC Stock and to sell new FMC stock;
> * * *

Each count of the prior pleadings, with the exception of one count in the Second Amended Complaint, alleges that petitioner's damages exceeded $235 million.  This amount corresponds to the claimed theft loss in that it approximates the sum of the

---

[3] The prior pleadings also allege fraudulent inducement, negligence, breach of fiduciary duty, and breach of contract by Goldman.

$217,649,340 additional cash payment (the claimed theft loss) and Goldman's $17.5 million fee.

We conclude that the issue here as to value is the same as in the prior case. Accordingly, we hold that this element of collateral estoppel is present in the instant case.

2. Issue Actually Litigated and Essential to Prior Decision

Petitioner asserts that the issue of whether it suffered a theft loss on account of Boesky's insider trading was not actually litigated in the prior case because, petitioner contends, it was not necessary to a holding there. Petitioner recognizes that: (1) Judge Pollack stated that petitioner had presented no evidence that the value of the old FMC shares was less than the $97 that it ultimately paid for those shares and (2) the Court of Appeals for the Second Circuit made similar statements as to that value. Petitioner discredits the courts' statements on the value of old FMC stock as dicta.

We disagree with petitioner that the courts' statements on value are dicta. First, as to the District Court, Judge Pollack's discussion of value was necessary to his holding there, it "received the full and careful consideration of the court that uttered it", and it "could [not] have been deleted without seriously impairing the analytical foundations of the holding". Sarnoff v. Am. Home Prods. Corp. 798 F.2d 1075, 1084 (7th Cir. 1986) ("A dictum is a statement in a judicial opinion that could

have been deleted without seriously impairing the analytical foundations of the holding--that, being peripheral, may not have received the full and careful consideration of the court that uttered it."). In deciding petitioner's claims in that case, the court observed initially that petitioner had before the court two theories for the recovery of damages, one of which was for the loss of the value of confidential information. FMC Corp. v. Boesky, 825 F. Supp. 623, 632 (S.D.N.Y. 1993). As to that theory, the court stated:

> the question here is what legally compensable value did FMC hold on behalf of its shareholders in keeping confidential prior to those dates information relevant to its planned restructure of the interests of its public and management shareholders in the corporate equity that was compromised by the alleged premature disclosure caused by Goldman Sachs' employees, and what is the best legal measure of that diminution in value of the information or plan as demonstrated by specific facts presented to the Court? [Id. at 633.]

In deciding that question, the court first noted:

> The exclusive use of the only information shown to have been leaked, that a possible recapitalization was in the works, unintentionally inured to the benefit--not the detriment--of the public shareholders, and the insiders commensurably shared the benefit of the rise and assertion of a stock price expressing the value of the equity. As elaborated below, FMC has failed to adduce any admissible evidence of specific facts that FMC sustained any increase in costs to it incurred to effectuate the restructure, or that any legitimate and legally cognizable value held by FMC in the financial information, which benefitted all its shareholders (at no cost to the company), was diminished in any way by premature disclosure. Correspondingly, the best measure of the compensable cost incurred by FMC or diminution in value of its plan

is zero.  FMC has thus failed to meet its evidentiary burden of adducing specific facts to evidence cognizable injury or damage to its shareholders or itself assertable against Goldman Sachs.  [Id.]

The court then concluded:

A careful consideration of the full record before the Court in the light most favorable to FMC plainly shows that:  FMC **failed to adduce** admissible evidence of specific facts showing that * * * the price paid by FMC to its own shareholders for the restructure was anything other than a fair price established by the open market;  [Id.]

The court reasoned:

An understanding of the essential economic nature of FMC's recapitalization transaction is crucial to the proper resolution of the issues before the Court.  In essence, the transaction was intended to increase the proportion of FMC's equity held by management and to correspondingly decrease that proportion held by public shareholders.  This would be achieved by returning to public shareholders, through cash payments, a fraction of their equity investment in FMC while leaving intact and unchanged management's equity investment, the result being, of course, that management would end up with a larger proportionate share of the reduced total equity investment in FMC.

The transaction would be fair to all parties if and only if the public shareholders received in cash the fair value of the equity they were asked to give up measured by open market values.  If they received more than the fair value of the equity given up, they would benefit at the cost of management.  If they received less than the fair value of the equity given up, they would be disadvantaged to the benefit of management.  FMC's claim suggests that it was harmed because its shareholders received too much--a remarkable proposition that was twice soundly rejected by the District Court in Chicago prior to the transfer to this Court.  As Judge Williams pointed out, "the transaction essentially is an instance of self-dealing" between management and public shareholders.  FMC Corp. v. Boesky, 673 F. Supp. 242, 250 (N.D. Ill. 1987).

Boesky's purchases of FMC stock as the market price advanced wiped out any premium in the deal price over the market price that the management shareholders expected would exist in their favor over the interests of the public shareholders. No admissible evidence was presented by FMC that the pre-transaction market price of FMC stock was artificially high and did not represent the stock's true fair value nor was there any other indication by specific fact that the recapitalization overcompensated FMC's public shareholders for the equity they gave up. Further, all shareholders, including the management shareholders, shared in the benefits of the rise in price of FMC's stock. * * *

The new FMC shares which were projected under the revised recapitalization to trade at about $17.14 per share opened actually at $19.25. This unerringly suggests that the projected price was in fact a slight under-valuation of the true fair value of FMC stock and not inflated. Where "the factual context renders [plaintiffs'] claim implausible--if the claim is one that simply makes no economic sense--[plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). FMC's bald assertion that the market price of FMC stock was artificially high in April, 1986, because of Boesky's buying program falls far short of this standard and is unsupported by specific facts.

Boesky may have reaped illegal profits in trading on the non-public information that a recapitalization was brewing, and he was sued by FMC therefor and settled in cash with FMC. But the only other parties who suffered legally cognizable injury would be those who bought or sold securities with Boesky directly, or even indirectly through the market, not FMC, whose recapitalization was neither executed on the market nor approved by FMC's shareholders until May 22, 1986, well after the non-public information had been publicly disclosed by FMC itself: first on April 2nd when it publicly filed its Form S-2 with the SEC and again on May 2nd when it publicly issued its joint proxy statement/prospectus. * * *

The value to FMC of keeping the financial information confidential until April 2, 1986--allowing FMC to consummate a recapitalization at $10 per share less than what eventually proved to be a fair price for the public shareholders' stock--is not a legitimate and legally cognizable value for which FMC may seek legal recourse.  FMC's insiders were not privileged to appropriate confidential corporate information for their own benefit, and to the detriment of public shareholders.  "Corporate insiders ... have an obligation to place the shareholder's welfare before their own...."  Chiarella v. United States, 445 U.S. 222, 230, 100 S. Ct. 1108, 1115-16, 63 L. Ed. 2d 348 (1980).  [Id. at 633-635 (footnote refs. omitted).[4]]

A discussion of the value of old FMC stock was also at the heart of the decision of the Court of Appeals for the Second Circuit in FMC Corp. v. Boesky, 36 F.3d 255 (2d Cir. 1994), when it affirmed Judge Pollack's decision upon appeal.  The Court of Appeals for

---

[4] Petitioner argues that Judge Pollack did not find as a fact that the value of old FMC stock was $97 at the time of the recapitalization but simply concluded that petitioner did not provide any admissible evidence to support a lower value.  We do not read this quoted language as narrowly as petitioner.  All the same, the application of collateral estoppel is not precluded simply because a party such as petitioner did not produce all of its evidence in the prior case.  Cory v. Commissioner, 159 F.2d 391, 392 (3d Cir. 1947), affirming a Memorandum Opinion of this Court.  Evidence which, by due diligence, could have been produced in the prior case is considered to have been available at the first case and, to the extent relevant to the issue in dispute, should have been introduced at the time of the prior case.  See Dean v. Commissioner, 56 T.C. 895, 900 (1971); Milberg v. Commissioner, 54 T.C. 1562, 1566 (1970).  In this regard, we reject petitioner's assertions that Judge Pollack made a conscious effort to prevent it from presenting any evidence as to the applicable value of the old FMC stock and that he otherwise minimized the probative value of any such evidence by considering it irrelevant to the case before him.

the Second Circuit began its analysis with a general overview of the case:

> At its heart, this appeal is about injury. FMC claims it spent $220 million more on its restructuring than it should have, and seeks to shift that cost to Goldman because of the illegal conduct of Goldman's employees, Brown and Brosens. FMC alleges that it is entitled to four types of relief: first, consequential damages based on the entire $220 million differential between the original restructuring plan and the consummated plan caused by Goldman's violations; second, compensatory damages for the lost value of its confidential information that was misappropriated and prematurely disclosed; third, disgorgement of Boesky's profits on the grounds that Goldman aided and abetted his violations of Rule 10b-5; and fourth, restitution of Goldman's $17.5 million fee because of Goldman's breach of its contractual and fiduciary duties.

> We agree with the combined decisions of district judges Williams and Pollack that FMC has either not alleged or is unable to prove a compensable injury. * * * We agree that under the undisputed facts of this case, the $220 million differential, the cost of creating the confidential financial projections and Goldman's fee cannot be recovered by FMC. In addition, because FMC has failed to state a claim against Goldman under Rule 10b-5, it cannot recover Boesky's profits. [Id. at 260.]

The Court of Appeals for the Second Circuit discussed in detail its reasoning for rejecting petitioner's claim for damages as to the $220 million differential. The court stated:

> FMC seeks to recover the $220 million difference in the amounts it paid out to shareholders under the plan originally proposed and the one eventually accomplished. It claims that Judge Pollack erred in granting summary judgment because "[t]he jury could ... reasonably conclude that Boesky's trading was a substantial factor in the rise of the price of FMC stock, and that the rise in the price of the stock forced FMC to abandon its original recapitalization

plan." In seeking to recover the additional amounts paid to its shareholders, FMC overlooks one important circumstance: because the excess amounts inured to the benefit of FMC's shareholders, FMC cannot claim that it was injured thereby.

> FMC's restructuring involved, on the one hand, a pro rata distribution of corporate assets to the public shareholders in return for their surrender of a portion of the publicly held equity. The management shareholders, in contrast, would maintain their current equity holdings with "the result being, of course, that management would end up with a larger proportionate share of the reduced total equity investment in FMC." FMC, 825 F. Supp. at 633. Aside from the purpose of discouraging takeover bidders by simultaneously increasing the percentage of shares held by management and FMC's debt-to-equity ratio, the economic effect of the transaction essentially was a wash--a zero sum transaction in which there were no special preferences afforded or profits to be made. By design every shareholder was supposed to receive identical consideration for each share given up in an amount equal to the value of each share. [Id. at 260-261.]

The court did note initially that FMC cannot claim injury because the additional cash payment inured to the benefit of its shareholders. Id. at 261. This was the basis for the District Court's dismissal of FMC's securities law claims. FMC Corp. v. Boesky, 727 F. Supp. at 1190. However, the Court of Appeals for the Second Circuit's decision did not rest, as alleged by petitioner, on a legal theory of equivalence between a corporation and its shareholders. The court explained:

> FMC's duty was to provide FMC public shareholders with consideration equal in value to that received by the management shareholders, and to disclose fully all information relevant to the public shareholders' evaluation of the deal. As Judge Pollack put it, FMC had no legitimate interest "in short-changing the

public shareholders in the restructure and achieving a windfall profit for themselves, by maintaining in confidence business information pertinent to the fair value of the stock...."  FMC, 825 F. Supp. at 633 * * *

FMC's claim that Boesky's insider trading caused the deal to be revised therefore misses the point. Because FMC's duties included making complete disclosure and fully compensating its shareholders, beyond showing that the transaction became more expensive, FMC must at least show that it paid more for the stock than it was worth.  FMC could not seek the "minimum premium," but rather was obligated to offer a "fair" price.  Because the shareholders were the equitable owners of the information, no claim of injury can lie where premature disclosure of that information benefitted them in their dealings with the FMC.  See FMC, 825 F. Supp. at 633.

Judge Pollack determined, and we agree, that FMC presented no evidence that the stock was not worth the $97 per share price ultimately paid, or that the $85 per share originally contemplated was adequate to compensate the public shareholders.  See id. at 634. * * *  FMC cannot claim that Boesky stole a premium the company was entitled to, since FMC had no legitimate interest in realizing a gain at its public shareholders' expense.  Therefore, even if Boesky's trades caused the stock price to rise prematurely, because the transaction was approved by both the shareholders and the board of directors, FMC cannot claim injury unless it shows, at a minimum, that the price increase also was artificial. * * *

Moreover, the court concluded that the record was sufficient

to establish that old FMC stock was worth at least $97 at the

time of the recapitalization.  The court observed:

That the $97 per share figure was warranted based on all available information is evident from the fact that FMC's board of directors voted to increase the cash payout and to continue to recommend the deal to the shareholders.  See Viacom Int'l Inc. v. Icahn, 946 F.2d 998, 1001 (2d Cir. 1991) (finding directors' valuation to be relevant in establishing "fair price"

higher than market price), cert. denied, 502 U.S. 1122, 112 S. Ct. 1244, 117 L. Ed. 2d 477 (1992).  In addition, on April 25, 1986, three weeks after FMC fully disclosed the projections and well after Boesky divested his interest in the company, FMC stock was still trading around $97 per share.  Furthermore, the "stub" share which was valued by FMC at about $17 per share, actually opened at $19.25 per share, indicating that the stock probably was still slightly undervalued in the transaction despite the increased cash payout. See FMC, 825 F. Supp. at 634.  In the face of this proof that the $97 per share figure was fair, FMC produced no evidence to the contrary.  The absence of evidence that the $220 million increased payout constituted something other than FMC giving its public shareholders full consideration for their stock is fatal to FMC's recovery of these amounts. * * *

As our quotations from the court's opinion show, the Court of Appeals for the Second Circuit did not merely hold that a corporation can never be damaged when it distributes corporate assets to the beneficial owners of those assets; i.e., the shareholders.  The essence of the court's decision is that petitioner failed to prove that it paid more than a fair price for old FMC stock.  As mentioned above, the absence of sufficient proof in the prior case precludes any claim by petitioner here that it sustained a theft loss as a result of the additional $10 per share cash payment to its public shareholders.  Petitioner simply gave its public shareholders something of value for equal value in return.[5]

---

[5] Petitioner points to the statement of the Court of Appeals for the Seventh Circuit in FMC Corp. v. Boesky, 852 F.2d 981, 991 (7th Cir. 1988), that Brown "stole to put it bluntly".  The mere fact that Brown "stole" the information does not mean, as

We conclude that the parties to the prior case actually litigated the issue before us today and that the issue was essential to the prior decision.  Accordingly, we hold that this element of collateral estoppel is present in the instant case.

3.  Absence of Special Circumstances

We consider whether special circumstances warrant an exception to the normal rules of preclusion.  Montana v. United States, 440 U.S. 147 (1979); Brotman v. Commissioner, 105 T.C. 141 (1995).  Special circumstances include the absence of a full and fair opportunity to litigate the issue in the prior case. Brotman v. Commissioner, supra at 151.  A mere allegation that the earlier decision was wrong will not suffice.  Id.  Collateral estoppel will not apply only if "there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation."  Montana v. United States, supra at 164 n.11.

There is no reason to question any aspect of the procedures followed by the courts in the prior case.  Those procedures amply afforded petitioner the opportunity to litigate its case.  In fact, after the prior case was transferred to Judge Pollack, petitioner conducted substantial discovery over a period of almost 2 years.  FMC Corp. v. Boesky, 36 F.3d at 260.  The court also held a 3-day evidentiary hearing on Goldman's motion for

petitioner would have it be, that petitioner is entitled to its claimed theft loss.

summary judgment at which numerous witnesses testified.  Not only did petitioner have a full and fair opportunity to litigate the damages issue in the prior case, it had every incentive, as the plaintiff in that case, to litigate the issue aggressively.  The fact that petitioner may have settled with Boesky or otherwise lacked an incentive to litigate against Boesky because he could not pay the sought-after damages does not mean that petitioner also lacked the same incentive as to Goldman.  We conclude that no special circumstances exist to cause us to exercise our discretion to warrant an exception to the normal rules of preclusion.

We hold that petitioner is collaterally estopped from deducting a theft loss in an amount equal to the additional cash payment of $217,649,340.  Petitioner's petition to this Court to allow it to deduct such a theft loss is merely a request to relitigate the applicable value of the old FMC stock in an attempt to ascertain a value that will compel the Treasury to subsidize petitioner's redemption of its shares from its public shareholders.  Petitioner's position in this Court, however, continues to be essentially the same as the position that it advanced in its prior case; to wit, that it was harmed because its shareholders received too much.  As recognized by Judge Pollack when he rejected that position, the position is "a remarkable proposition that was twice soundly rejected by the

District Court in Chicago".  <u>FMC Corp. v. Boesky</u>, 825 F. Supp. at 634.

All arguments for a contrary holding have been considered and have been rejected as meritless to the extent not discussed herein.  Accordingly,

<u>An order will be issued</u>

<u>granting respondent's motion</u>

<u>for summary judgment, and</u>

<u>decision will be entered for</u>

<u>respondent</u>.